**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>vs.<br><br>Jorge Gerardo Rodriguez-Rubio,<br><br>   Defendant. | CR 13-1784-TUC-RCC (JR)<br><br>**REPORT AND**<br>**RECOMMENDATION** |

This matter was referred to Magistrate Judge Rateau for pretrial matters. On November 19, 2013, Defendant Rodriguez-Rubio filed a Motion to Suppress evidence seized following the stop of his vehicle. (Doc. 15). The Government filed a Response on December 10, 2013. (Doc. 24). A reply was not filed. The matter was heard by the Court on January 15, 2014. Defendant was present and represented by counsel. The Government presented three witnesses. Fifteen exhibits were

1

1  admitted at the hearing.  Having considered the matter, the Magistrate Judge

2  recommends that Defendant's motion be denied.[1]

3  **I.      Findings of Fact**

4         Border Patrol Agents Duran and Silva are experienced agents with

5  approximately twenty years of experience between the two of them. They are

6  familiar with the area surrounding Three Points, Arizona, located approximately 45

7  miles from United States/Mexico international border.  On September 20, 2013, the

8  agents were travelling in a marked law enforcement vehicle patrolling the area of

9  Diamond Bell Road and Sierrita Mountain Road.  Diamond Bell is a road that curves

10 sharply and turns into Sierrita Mountain Road.  According to the agents, the area is

11 commonly used to smuggle narcotics and aliens because it avoids a state route that is

12 heavily patrolled by law enforcement.  Each agent previously participated in drug

13 and alien related stops in the area.

14         According to the agents they were working the 6 a.m. to 2 p.m. shift.  When

15 asked to describe the traffic flow at that time, the agents explained that traffic is

16 minimal and only increases from about 6 a.m. to 8 a.m., and from about 2 p.m. to 3

17 p.m. as people are going to working and picking up children from school.

18         At about 9:45 a.m., while travelling west on Diamond Bell Road, the agents

19 observed a silver Suzuki SUV travelling east on the road.  Travelling very close

20 _____

21 [1] Trial is scheduled for February 19, 2014.  The plea deadline is January 31, 2014. (Doc. 19).

22

behind the SUV was another vehicle, a white GMC truck. Believing that the vehicles were travelling in tandem, the agents decided to turn their patrol car around and follow them. The agents defined "tandum driving" as a tactic used by drug traffickers where one car is loaded with contraband (the "load" car) and the other car (the "heat" vehicle) acts as the scout or security to distract law enforcement and ensure that the load vehicle escapes detection.

As the agents followed the truck, they made a note of the license plate number in order to request a records check on the vehicle. The cars travelled east on Diamond Bell Road and as they approached the area of the road that curves north and becomes Sierrita Mountain Road, the truck decreased its speed to about 40 miles per hour and the SUV increased its speed to about 50 miles per hour. The posted speed in the area is 50 miles per hour.

Believing that the truck was trying to distract the officers' attention from the SUV, the agents passed the truck in order to pursue the SUV. As they drove by the truck, the agents noticed that the driver was a young male. He was talking on his cell phone while looking back at the border patrol vehicle. After catching up to the SUV, the agents noted that its driver was a female, was also talking on a cell phone and was also watching the border patrol vehicle. The agents surmised that the drivers were speaking to one another. The truck then accelerated, closing to within two to four car lengths of the patrol car. This behavior confirmed the agents' belief that the vehicles were working in a coordinated fashion.

1    As the SUV approached Hunt Road, the driver abruptly turned west onto Hunt

2  Road.  Hunt road is not a paved road and provides no direct route to any major

3  highway or business.   There are mostly rural type private homes in the area.   The

4  truck did not follow the SUV onto Hunt Road but kept travelling north on Sierrita

5  Mountain Road.   By this time, the agents had radioed Border Patrol Agent Lopez,

6  who was working in the area north of where Agents Silva and Duran were patrolling.

7  They provided Agent Lopez with the license plate number of the white GMC truck,

8  updated him as to what was happening and asked him to keep an eye out for the

9  truck.  Meanwhile, Agents Duran and Silva continued to follow the SUV.  They then

10  noticed that the truck was behind their patrol car.   The agents concluded that the

11  sudden appearance of the truck on Hunt Road meant that the truck had made a u-turn

12  on Sierrita Mountain Road, traveled south and then west onto Hunt Road in an

13  attempt to locate the SUV.

14    The agents followed the SUV as it travelled a short distance on Hunt Road and

15  then made an abrupt turn and headed north on Newbolo Place.   When the agents

16  attempted to stop the SUV, the GMC continued past them heading west on Hunt

17  Road.  After stopping, the six occupants of the SUV ran from the car.  Four of the six

18  were males dressed in camouflaged clothing.   None of the occupants of the SUV

19  were found.   After finding bundles of marijuana in the SUV, the agents again

20  contacted Agent Lopez and told him that the truck would likely travel back to Sierrita

21  Mountain Road from one of the streets north of Hunt Road.   Agent Lopez was asked

22  to stop the GMC truck.

4

1    Agent Lopez in fact saw the truck turn north onto Sierrita Mountain Road near

2    Hunt Road.  After confirming that the truck matched the description given to him by

3    Agents Silva and Duran, Agent Lopez stopped truck.  The driver of the truck, the

4    Defendant, was placed under arrest.  He gave officers consent to search the truck.

5    Agents found non-contraband evidence in the truck allegedly linking the Defendant

6    to the marijuana in the SUV.[2]

7    **II.    Conclusions of Law**

8    The Fourth Amendment protects a person against unreasonable searches and

9    seizures.  *United States v. Hensley*, 469 U.S. 221, 226 (1985).  Consistent with the

10   Fourth Amendment, police may stop persons in the absence of probable cause under

11   limited circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968).  The police may briefly

12   stop a moving automobile to investigate a reasonable suspicion that its occupants are

13   involved in criminal activity.  *Hensley*, 469 U.S. at 226.

14   Reasonable suspicion exists when an officer is aware of specific articulable

15   facts, that, together with rational inferences drawn from them, reasonably warrant a

16   suspicion that the person to be detained has committed or is about to commit a crime.

17   *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).   When assessing the

18   reasonableness of the police officer's actions, the court must consider the totality of

19

20   _____

21   [2] In part, the defense seeks to suppress the identity of the Defendant.  While the Court need
     not reach this issue, it does note that even if a person is illegally stopped, his identity is not

22   suppressible. *See United States v. Ortiz-Hernandez*, 427 F.3d, 567, 577 (9th Cir. 2005).

1   the circumstances which confronted the officer at the time of the stop.  *United States*

2   *v. Sokolow*, 490 U.S. 1, 8 (1989).

3       The articulable facts forming the basis of a reasonable suspicion must be

4   measured against an objective reasonableness standard, not by the subjective

5   impressions of a particular officer.  *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1445

6   (9th Cir. 1994).  An officer is however, "entitled to assess the facts in light of his

7   experience in detecting illegal entry and smuggling." *United States v. Brignoni-*

8   *Ponce*, 422 U.S. 873, 885 (1975).  But the inferences drawn from an officer's

9   experience must be objectively reasonable.  *United States v. Montero–Camargo*, 208

10  F.3d 1122, 1131 (9th Cir. 2000) (en banc).

11      Under the collective knowledge doctrine, a court may impute police officers'

12  collective knowledge to the officer conducting the stop, search, or arrest.  *United*

13  *States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010).  So long as the officer who

14  orders the arrest or search has knowledge of facts establishing probable cause, it is

15  not necessary that the officers actually making the arrest or conducting the search be

16  personally aware of those facts.  U*nited States v. Massenburg*, 654 F.3d 480, 493 (4th

17  Cir. 2011).

18      In relation to stops by border patrol agents, the totality of circumstances may

19  include:

20      (1) characteristics of the area; (2) proximity to the border; (3) usual
        patterns of traffic and time of day; (4) previous alien or drug smuggling
21      in the area; (5) behavior of the driver, including obvious attempts to
        evade officers; (6) appearance or behavior of passengers; (7) model and
22      appearance of the vehicle; and, (8) officer experience.

6

*United States v. Berber–Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007); *United States v. Valdes-Vega*, ---F.3d ---, 2013 WL6768095 (9th Cir. 2013).

Guided by these factors the Court must determine whether the factors cited by the Government in support of the stop constitute behavior that should excite the suspicion of a trained border patrol agent that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), *amended by United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

### A.     Characteristics of the Vehicle

No evidence was presented that either the SUV or the truck looked as if they carried contraband, had recently been loaded with contraband or were even the type of vehicle suitable or commonly used to carry contraband.  Nothing about the vehicles made it difficult for the agents to see into the vehicles. The appearance of the cars does not factor into the Court's determination of reasonable suspicion.

### B.     Patterns of Traffic and Time of Day

According to Agents Silva and Duran, traffic in the area increases between 6 a.m. and 8 a.m. when people are going to work.  It also increases from 2 p.m. to 3 p.m. when people are picking their children up from school.  The stop in this case occurred at 10 a.m., a time when traffic was minimal in the area.  Other than solidify the inference that the truck seen earlier by Agents Silva and Duran was the same truck seen and stopped later by Agent Lopez, the pattern of traffic and the time of the stop carries no weight in the totality of the circumstances analysis.

C.      **Proximity to the Border, Characteristics of the Area,
and Previous Drug Smuggling**

Although 45 miles north of the border, the location of the stop is significant. According to Agents Silva and Duran, because of its remoteness and its distance from a regularly patrolled area, the Three Points, Arizona area is often used by alien and drug traffickers to avoid detection from law enforcement.  Both agents have a great deal of experience investigating alien and drug smuggling in the area and each has personally participated in seizures of drugs and aliens near the area of the stop. This factor deserves considerable weight in the Court's analysis.  *See Berber-Tinoco*, 510 F.3d at 1088 (The totality of the circumstances analysis includes a consideration of the modes or patterns of operation of certain kinds of law-breakers.)

D.      **Behavior of Driver**

The Defendant's driving is the most important factor in this analysis.  Agents Silva and Duran first became aware of the Defendant when they saw his truck closely following an SUV.  Believing that the vehicles were driving in tandem, the agents decided to get a closer look.  Since they were travelling in the opposite direction from the SUV and the truck, they quickly made a u-turn and caught up to the truck.  As the three vehicles approached the sharp curve where Diamond Bell Road becomes Sierrita Mountain Road, the truck decelerated and the SUV accelerated.  To the agents, this behavior meant that the driver of the truck was trying to put distance between the SUV and the border patrol vehicle in order to help the SUV escape.  The defense correctly points out that it is not unusual for people to

8

1    slow down when a police car quickly approaches from behind.  Nor is it unusual for a

2    car to slow down as it approaches a sharp curve in the road.  Nonetheless, given their

3    training and experience, the agents concluded that the SUV might be a load vehicle

4    and that the truck might be a heat vehicle.

5          Reasonably believing that the drivers of the vehicles were driving in a manner

6    that agents recognized as common to drug smugglers, they decided to pass the truck

7    and get behind the SUV. As they did this, the agents noticed that the driver of the

8    truck was using a cell phone and looking over at the agents.  Once behind the SUV,

9    the agents noticed that the driver of the SUV was also using a cell phone and was

10   also looking at the border patrol car.  This behavior led the agents to conclude that

11   the driver of the truck was communicating with and trying to help the SUV get away

12   from police.

13         In fact, the SUV made an evasive maneuver and quickly turned onto a dirt

14   road.  The agents followed and stopped the SUV.  The truck continued on but then

15   apparently made a u-turn and drove up to the exact location where the agents had

16   stopped the SUV.  Anticipating that the truck would go back to Sierrita Mountain

17   Road, the agents asked Agent Lopez for help.  Agent Lopez found the truck,

18   confirmed that it was the same truck that Agents Silva and Duran had seen earlier

19   and conducted a traffic stop.  These many instances of tandem driving along with the

20   suspected communication between the drivers of the SUV and the truck carry

21   significant value in the reasonable suspicion calculus. *See United States v. Robert L.*,

22   874 F.2d 701, 704 (9th Cir. 1989). (Traveling in tandem can be a factor that can be

1  considered in developing reasonable suspicion, however, the determination must be

2  based on more than the "briefest of observations.")

3      **E.      Totality of Circumstances**

4      Giving due weight to the collective knowledge of the agents involved along

5  with the reasonable inferences drawn by the officers, the Court finds that there was

6  reasonable suspicion to believe that Defendant was engaged in illegal activity.  The

7  stop comported with the Fourth Amendment.

8  **III.    Recommendation for Disposition by the District Judge**

9      Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule

10  Civil 72.1, Rules of Practice of the United States District Court, District of Arizona,

11  the Magistrate Judge recommends that the District Court, after an independent review

12  of the record, DENY Defendant's Motion to Suppress (Doc. 15).

13      This Report and Recommendation is not an order that is immediately

14  appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to

15  Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of

16  the District Court's judgment in the case.

17      The parties have fourteen (14) days from the date of service of a copy of this

18  report and recommendation to file specific written objections with the District Court.

19  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of

20  Civil Procedure.

21      Thereafter, the parties have ten (10) days within which to file a response to the

22  objections. No replies are permitted without leave of court.

1    If any objections are filed, this action should be designated case number: CR

2  13-1784-TUC-RCC.   Failure to timely file objections to any factual or legal

3  determination of the Magistrate Judge may be considered a waiver of a party's right

4  to de novo consideration of the issues.  *See United States v. Reyna-Tapia*, 328 F.3d

5  1114, 1121 (9th Cir. 2003) (en banc).

6    Dated this 21st day of January, 2014.

Jacqueline M. Rateau
United States Magistrate Judge

11